# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| BRUCE S. JOHNS, | CASE NO. 1:20-cv-02810 |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Bruce S. Johns ("Plaintiff" or "Mr. Johns") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income (SSI).  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.      Procedural History

Mr. Johns filed his application for SSI on January 10, 2019.  (Tr. 15, 85, 93, 163-68.)  He asserted a disability onset date of March 1, 1992.  (Tr. 15, 85, 163.)  He alleged disability due to major depressive disorder, PTSD, anxiety disorder, panic disorder, antisocial personality disorder, and cocaine abuse.  (Tr. 85, 106, 114, 184.)   His application was denied at the initial level (Tr. 106-08) and upon reconsideration (Tr. 114-18).  He then requested a hearing.  (Tr. 119-

1

21.)  A hearing was held before an Administrative Law Judge ("ALJ") on January 28, 2020.  (Tr. 30-59.)

On February 26, 2020, the ALJ issued an unfavorable decision, finding Mr. Johns had not been under a disability since January 10, 2019, the date the application was filed.  (Tr. 12-29.) Mr. Johns requested review of the ALJ's decision by the Appeals Council.  (Tr. 160-62.)  On October 20, 2020, the Appeals Council denied Mr. Johns' request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.       Evidence

### A.       Personal, Educational, and Vocational Evidence

Mr. Johns was born in 1959.  (Tr. 25, 163.)  He has his GED.  (Tr. 236.)  He was incarcerated for 20 years.  (Tr. 40, 236.)  He had been living independently in an apartment for two years as of January 2020.  (Tr. 49.)  He last worked in 2006, cleaning and painting pits in steel mills. (Tr. 37-40.)

### B.    Medical Evidence

#### 1.    Treatment History

##### i.       Physical Impairments

 On March 5 and June 6, 2018, Mr. Johns saw Antwon Morton, D.O. at MetroHealth for follow-up visits regarding back, right knee, and right Achilles pain.  (Tr. 349, 351.)  During the March visit, he rated his pain a 7/10.  (Tr. 351.)  In June, he rated his pain a 5/10.  (Tr. 349.)  At both visits, he reported that he managed his pain by taking Percocet 5/325 mg tablets twice a day.  (Tr. 349, 351.)  He was going to a gym but had not been consistent with a lower extremity strengthening program.  (Tr. 349.)  The March and June treatment notes contain a report from a June 27, 2014 MRI of the right ankle, which showed: degenerative changes in the ankle and

2

hindfoot, tendinosis and partial tear of the Achilles tendon without complete rupture, probably chronic tear of the anterior talofibular ligament, mild posterior tibial tenosynovitis, and no occult fracture.  (Tr. 349, 351.)

Examination findings at the March and June 2018 visits were similar.  (Tr. 350, 352.) The back examinations showed mildly decreased range of motion in all planes, tenderness at the lumbosacral junction/interspace and lumbo-sacral spinal muscles bilaterally, and increased back pain bilaterally without radicular symptoms with straight leg raise.  (*Id*.)  There was normal lumbar lordotic curvature, no evidence of scoliosis, spasm, or trigger points, and provocative testing was negative.  (*Id*.)  Mr. Johns' joint examination in the right ankle was limited due to pain, and there some difficulty in the right lower extremity examination due to pain.  (*Id*.)  There was tenderness to palpation over the right Achilles tendon insertion.  (*Id*.)  Examinations of the right knee were normal.  (*Id*.)  Mr. Johns' neurological examinations were normal, and he demonstrated normal sensation and motor strength in the bilateral upper and lower extremities, normal fine motor coordination, and normal gait.  (*Id*.)

Dr. Morton's impression at both visits was that Mr. Johns' low back pain, right knee pain, and right Achilles tendinopathy were "stable overall."  (*Id*.)  At the March visit, Dr. Morton recommended an EMG to assess for right lower extremity weakness/atrophy, and recommended that Mr. Johns use Motrin 800 mg for pain.  (Tr. 352.)  Dr. Morton also refilled Mr. Johns' Percocet, to be used sparingly for severe pain, and recommended that Mr. Johns continue with daily home exercises for lower extremity strengthening.  (*Id*.)  During the June visit, Dr. Morton noted that EMG results were reviewed.  (Tr. 350.)  The treatment plan was not changed.  (*Id*.) The record does not contain additional MetroHealth treatment records relating to Mr. Johns' low back, knee, or ankle pain.

On April 30, 2019, Mr. Johns presented to Circle Health Services (aka Centers (Tr. 381)) to establish care, complaining of hypertension and back and ankle pain.  (Tr. 385.)  He saw Daniel Gauntner, APRN, CNP.  (*Id*.)  He reported chronic ankle pain due to a torn Achilles that had not healed.  (Tr. 386.)  He complained that it hurt to walk.  (*Id*.)  He also complained of back pain that was worse when it rained.  (*Id*.)  During a musculoskeletal examination, Mr. Johns' range of motion was normal and he had no edema or tenderness.  (Tr. 389.)  Recommendations included increasing regular exercise to five days a week with more brisk walking, cardio, and weightlifting.  (Tr. 390.)

Mr. Johns returned to CNP Gauntner on June 5, 2019, with his chief complaint being hypertension.  (Tr. 399.)  There were no complaints regarding his back or ankle pain and his musculoskeletal examination was normal.  (Tr. 399, 402.)

Mr. Johns saw Rodney Trimble, D.O. at Centers on October 8, 2019 for follow up regarding his hypertension.  (Tr. 408.)  He did not complain of back or ankle pain and his musculoskeletal examination was normal.  (Tr. 408, 412.)

### ii.      Mental Health Impairments

On June 24, 2016, Mr. Johns was assessed by Cassandra Klein, LSW at The Centers for Families and Children ("CFC").  (Tr. 234-39.)  He reported that he was interested in resuming medications to treat his symptoms, which included getting aggressive more easily and anxiety with shortness of breath.  (Tr. 235.)  He reported a hospitalization in 2004 for suicidal ideation and prior mental health treatment.  (Tr. 235-36.)  Mr. Johns was diagnosed with PTSD due to flashbacks of past violence and anxiety disorder.  (Tr. 234, 237-38.)

Mr. Johns continued treatment through CFC and saw Patrick Runnels, M.D. for a psychiatry visit on February 26, 2018.  (Tr. 240-41.)  His chief complaint was anxiety and

depression.  (Tr. 240.)  He reported that the severity of his symptoms was "only somewhat interfering with getting through the day," and reported that his primary issue with his anxiety was irritability and controlling his worrying.  (*Id*.)  He reported that he was very involved with narcotics anonymous ("NA"), attending several meetings each week.  (*Id*.)  Dr. Runnels diagnosed anxiety NOS, noting that Mr. Johns previously met the criteria for PTSD and was "clearly doing well, with residual symptoms."  (Tr. 241.)  Dr. Runnels prescribed Seroquel for irritability and recommended follow up in twelve weeks.  (*Id*.)

Mr. Johns returned to Dr. Runnels on May 21, 2018.  (Tr. 242.)  He reported that "things [were] going well . . . he [had] been doing a lot of travelling with friends who [were] helping him feel good about things."  (*Id*.)  He reported that he continued traveling to NA conventions and speaking a lot, which was helping him feel less anxious.  (*Id*.)  He rated the severity of his anxiety symptoms as "mild to moderate in severity," and reported doing "[b]etter than last time." (*Id*.)  He reported that his sleep was good, his depression was not a problem, and his anxiety was really only a problem when he was home alone, and that he went out more as a way to cope. (*Id*.)  He stated Seroquel was helping with his irritability.  (*Id*.)  It was noted that Mr. Johns was processing his feelings relating to Dr. Runnels' departure.  (*Id*.)  Dr. Runnels continued to diagnose anxiety and prescribe Seroquel for irritability, noting that Mr. Johns was "clearly doing well, with mild residual symptoms."  (Tr. 243.)

During a September 26, 2018 walk-in behavioral health visit at Centers with Bonnie Kaput, APRN, CNP for a refill of Seroquel, Mr. Johns reported that he had been more agitated and not sleeping well since being out of medication for "about a week."  (Tr. 250.)  He also reported "a little anxiety" but denied suicidal or homicidal ideation, hallucinations, paranoia, aggressive or violent behavior, recent hospitalizations, or adverse side effects.  (Tr. 250, 251.)

On mental status examination, Mr. Johns' motor activity was described as restless and his reported mood was neutral, but his appearance was appropriate, he was generally relaxed and engaged with a bright affect and good eye contact, his insight and judgment were appropriate, his memory was grossly intact, and his intellect was average. (Tr. 251.) Risk of harm to himself or others was rated as low. (*Id*.) He was diagnosed with major depressive disorder recurrent moderate and avoidant personality disorder. (*Id*.) His Seroquel was continued for mood stabilization and sleep. (*Id*.) CNP Kaput stressed the importance of adherence to his medication and appointments. (*Id*.)

Mr. Johns returned to Centers on April 15, 2019. (Tr. 381.) He saw Peter Koontz, APRN, CNP regarding his depression and anxiety. (*Id*.) He acknowledged missing follow-up appointments after last seeing CNP Kaput in September 2018. (*Id*.) He was initially agitated and angry about having to see multiple providers at Centers and having difficulty getting follow up appointments. (Tr. 381, 383.) However, he calmed down throughout the session. (Tr. 383.) He acknowledged receiving medication refills earlier in April but reported that his medication was not alleviating his anger or stress, and that his sleep was poor. (Tr. 381.) He reported an increase in symptoms over the prior four to six months. (Tr. 381.) He denied suicidal ideation, but reported homicidal ideation with no plan or intent. (Tr. 382, 383.) On mental status examination, Mr. Johns' motor activity was described as restless; his behavior and manner was described as guarded, irritable, and anxious; his affect was blunted; his speech was loud; his reported mood was sad, nervous, anxious, and angry; and he expressed homicidal ideations. (Tr. 382.) His appearance, insight, and judgment were appropriate, his eye contact was good, his memory was intact, and his intellect was average. (Tr. 382-83.) His risk of harm to himself and others was rated low. (Tr. 383.) Mr. Johns was diagnosed with major depressive disorder,

recurrent episode, mild and anxiety disorder, unspecified type.  (*Id.*)  Mr. Johns expressed

concern about being on multiple medications.  (*Id.*)  CNP Koontz started him on Zoloft for

depression and anxiety, and decreased his Seroquel.  (*Id.*)  A few weeks later, on April 30, 2019,

CNP Gauntner observed Mr. Johns to have a normal mood and affect when treating him for

hypertension and back and ankle pain.  (Tr. 385, 389.)

Mr. Johns returned to Centers for follow up psychiatric treatment on May 6, 2019, where

he saw Dwayne Reed, RN.  (Tr. 392.)   He reported that he had not started taking his psychiatric

medications until May 3, 2019, and that they were causing diarrhea.  (Tr. 392, 393.)  He denied

current stressors or suicidal/homicidal ideation.  (*Id.*)  On mental status examination, his affect

was blunted and his mood was reported to be "tired" and neutral, but he was cooperative and his

eye contact was good, his motor activity was calm, and his appearance, insight, and judgment

were appropriate.  (*Id.*)  His diagnoses were unchanged.  (Tr. 393.)  RN Reed reviewed the case

with CNP Koontz.  (*Id.*)  Per CNP Koontz's instructions, Mr. Johns was advised he could stop

taking Zoloft if his diarrhea persisted.  (*Id.*)

Mr. Johns saw CNP Koontz on May 29, 2019.  (Tr. 395.)  He reported he had stopped

taking Zoloft a few days earlier due to diarrhea, and that he did not feel it helped.  (*Id.*)  He

reported that he was still taking Seroquel, at the previously prescribed higher dose.  (*Id.*)  On

examination, CNP Koontz observed that Mr. Johns was neat, clean, and dressed appropriately;

he was cooperative and engaged; his speech was normal; his thought process was goal directed,

linear, and coherent; there was no abnormal thought content or perceptual distortions; he was

depressed and anxious with a constricted affect that was congruent to mood and appropriate; he

maintained good eye contact and was calm but withdrawn; he denied suicidal and homicidal

thoughts; his cognition was intact; he had moderate insight; and there was no impairment in

judgment.  (Tr. 396.)  Mr. Johns' diagnoses remained unchanged.  (Tr. 397.)  CNP Koontz discontinued Zoloft due to reported side effects and discontinued Seroquel due to ineffectiveness and possible metabolic side effects.  (*Id*.)  He started Mr. Johns on a trial of Remeron for mood, sleep, and anxiety and Vistaril for anxiety.  (*Id*.)

When Mr. Johns saw CNP Koontz on September 23, 2019 for follow up, he reported he continued to have irritability, sleep disturbance, and anxiety/panic.  (Tr. 404.)  He reported "getting agitated, hard to breathe sometimes…the medication ain't helping."  (*Id*.)  He expressed frustration over multiple trials of medications, stating "I feel like a guinea pig, just want something that works."  (*Id*.)  He inquired about Xanax.  (*Id*.)  He reported that he was trying to start a community garden and was working on getting soil samples.  (*Id*.)  He reported that he continued to attend NA meetings five or six times each week and he had a supportive sponsor. (*Id*.)  On examination, CNP Koontz observed that Mr. Johns was neat, clean, and dressed appropriately; his speech was normal; his thought process was goal directed, linear, and coherent; there was no abnormal thought content or perceptual distortions; he was depressed, anxious, and irritable, with a constricted affect that was congruent to mood and appropriate; he maintained good eye contact; he was hostile but engaged; he denied suicidal and homicidal thoughts; his cognition was intact; he had moderate insight; and there was no impairment in judgment.  (Tr. 405-06.)  CNP Koontz noted that Mr. Johns was visibly frustrated during the session that day.  (Tr. 406.)  He discussed with Mr. Johns that it could take time before results were seen from psychiatric medications, and titration was required.  (*Id*.)  CNP Koontz also explained that he did not regularly prescribe Xanax for long-term treatment of anxiety and depression.  (*Id*.)  Mr. Johns indicated that he might look to obtain services from a different location but requested medication refills.  (*Id*.)  Mr. Johns was diagnosed with major depressive

disorder, recurrent episode, mild and anxiety NOS, with a note to rule out generalized anxiety

disorder versus panic disorder.  (*Id*.)  CNP Koontz increased his Remeron and Vistaril.  (*Id*.)

Mr. Johns saw CNP Koontz again on November 22, 2019.  (Tr. 414.)  He reported that

things were going okay, although his back was still hurting.  (*Id*.)  He reported living on his own

in an apartment.  (*Id*.)  He reported attending meetings, spending time alone, reading

occasionally, and listening to music.  (*Id*.)  He also reported having a good relationship with his

family.  (*Id*.)  He was planning on seeing them over the holidays and frying a turkey.  (*Id*.)  He

reported missing medications once or twice each week.  (*Id*.)  He indicated that he had

experienced diarrhea as a medication side effect, but it had stopped.  (*Id*.)  On examination, CNP

Koontz observed that Mr. Johns was neat, clean, and dressed appropriately; he was cooperative

and engaged; his speech was normal; his thought process was goal directed, linear, and coherent;

there was no abnormal thought content or perceptual distortions; he was anxious with a

constricted affect that was congruent to mood and appropriate; he maintained good eye contact;

there were no abnormal movements; he denied suicidal and homicidal thoughts; his cognition

was intact; he had moderate insight; and there was no impairment in judgment.  (Tr. 415-16.)

His risk of harm to himself and others was rated as low.  (Tr. 416.)  Mr. Johns reported "overall

stability" with his current medications with some residual symptoms of anxiety and sleep

disturbance.  (*Id*.)  CNP Koontz noted that Mr. Johns was calm and appropriate that day, and that

he brightened up when he talked about football and his plans to fry a turkey for Thanksgiving.

(*Id*.)  Mr. Johns' diagnoses and medications were unchanged.  (*Id*.)

2.    **Opinion Evidence**

i.    **Treating Source**

On December 31, 2019, CNP Koontz completed a "Mental Impairment Questionnaire," noting that he started seeing Mr. Johns in April 2019 and Mr. Johns had be diagnosed with major depressive disorder, unspecified anxiety disorder, and cocaine disorder in sustained remission.  (Tr. 419-20.)  CNP Koontz rated Mr. Johns' abilities in the following four main areas: (1) sustained concentration and persistence; (2) understanding and memory limitations; (3) social interaction limitations; and (4) adaptation limitations.  (Tr. 419-20.)  The available rating choices were:

- unlimited or very good,

- limited but satisfactory,

- seriously limited, but not precluded, meaning "ability to function in this area is less than satisfactory, but not precluded in all circumstances" and the "[i]ndividual would be limited in [his] ability to perform activity 15% of time,"

- unable to meet competitive standards, and

- no useful ability to function.

(Tr. 419.)  CNP Koontz opined that Mr. Johns had no understanding or memory limitations.  (Tr. 420.)  In the area of sustained concentration and persistence, CNP Koontz opined that Mr. Johns:

- would have an unlimited or very good ability to carry out very short and simple instructions and carry out detailed instructions;

- would have a limited but satisfactory ability to maintain attention and concentration for extended periods, perform activities within a schedule, manage regular attendance and be punctual within customary tolerances, sustain an

10

ordinary routine without special supervision, complete a normal workday and
workweek without interruptions from psychologically based symptoms, and
perform at a consistent pace without an unreasonable number and length of rest
periods; and

- would be seriously limited, but not precluded from working in coordination with
  or in proximity to others without being distracted by them.

(Tr. 419.) In the area of social interaction, CNP Koontz opined that Mr. Johns:

- would have an unlimited or very good ability to ask simple questions or request
  assistance; and

- would be seriously limited, but not precluded from interacting appropriately with
  the general public, accepting instructions and responding appropriately to
  criticism from supervisors, getting along with coworkers or peers without
  distracting them or exhibiting behavioral extremes, and maintaining socially
  appropriate behavior and adhering to basic standards of neatness and cleanliness.

(Tr. 420.)  In the area of adaptation, CNP Koontz opined that Mr. Johns:

- would have an unlimited or very good ability to be aware of normal hazards and
  take appropriate precautions;

- would have a limited but satisfactory ability to set realistic goals or make plans
  independently of others; and

- would be seriously, but not precluded from responding appropriately to changes
  in the work setting.

(*Id*.)

11

### ii.      Psychological Consultative Examiner

On May 15, 2019, Mr. Johns attended a psychological examination conducted by clinical psychologist Richard N. Davis.  (Tr. 372-73.)  Dr. Davis noted that he had to repeat questions multiple times because Mr. Johns sat sideways in his chair and mumbled answers.  (Tr. 372.)  Dr. Davis further reported that he was unable to complete the evaluation because Mr. Johns became increasingly agitated as the interview progressed.  (*Id*.)  He commented that Mr. Johns "was obviously becoming more and more agitated" and he "felt that to continue was not going to be wise and possibly even dangerous."  (*Id*.)  He noted that Mr. Johns "was obviously in no mood to respond to [his] questions," and reported that Mr. Johns said he "was irritable because he doesn't get enough sleep."  (*Id*.)  Dr. Davis also suggested "it would be wise to have his case manager sit in on the interview" if the examination was rescheduled.  (*Id*.)  No opinions or diagnoses were offered.  (Tr. 372-73.)

### iii.      State Agency Psychological Consultants

On February 5, 2019, state agency psychological consultant Kristen Haskins, Psy.D. reviewed the file, noting that Mr. Johns had refused to consent to a psychological consultative examination and that there was insufficient evidence in the file to evaluate the claim.  (Tr. 88-90.)  Upon reconsideration, on May 31, 2019, state agency psychological consultant Robyn Murry-Hoffman, Ph.D. reviewed the file, and also found that there was insufficient evidence to evaluate the claim.  (Tr. 99-102.)  Dr. Murry-Hoffman noted that Mr. Johns had attended a psychological examination, but was uncooperative and very agitated, which resulted in the examination not being completed.  (*Id*.)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At his January 28, 2020 hearing, Mr. Johns testified in response to questioning by the ALJ and his representative.  (Tr. 37-51.)   When asked why he thought he could not work, he stated:

> You know, I, I can't stand that long.  So my back starts hurting.  I tore my Achilles tendon back in '07, '08, it didn't heal right, and my pain management doctor says it's just something I'm gonna have to live with it, it'll never get better.  Besides that, I've been to the penitentiary for over 20 years, and even when I try to find a job, human resources, once my application go to human resources, I was --

(Tr. 40.)  Mr. Johns subsequently discussed treatment he received for his back and ankle pain, explaining that he saw a pain management specialist and went to physical therapy in 2016 and 2017, but stated he was ultimately told that his pain would not get better and he would have to "live with it."  (Tr. 45-46.)   He reported trying pain medication, but that it made him "loopy" when he took it along with his mental health medication so the pain medication was discontinued.  (Tr. 46.)  He also reported trying an orthotic in his shoe to help with his Achilles tendon.  (*Id*.)   He estimated being able to stand at one time for about ten to fifteen minutes before his back started to hurt and he needed to sit down for about forty-five minutes.  (Tr. 46-47.)  He testified that his pain made him uncomfortable and more agitated.  (Tr. 47-48.)

Mr. Johns testified that his mental health also impacted his ability to work, explaining he received mental health treatment for anxiety and anger issues.  (Tr. 41.)  He testified that he tried to control his agitation, but that his sleep habits and people made him more agitated.  (*Id*.)  When asked about treatment notes reflecting his irritability during medical appointments, he explained:

> I think I'd be agitated sometimes 'cause I just can't get to where I wanna get with the problem, and I had got used to one doctor, he was pretty okay, we, we have a rapport, then the Centers kinda changed, now it's just, seem like they ask the wrong questions.

13

(*Id*.)  He also explained that one doctor agitated him a lot because the doctor was insistent that everything was his fault.  (Tr. 41-42.)   He reported that he got verbally angry when agitated, noting that in the past he had been violent.  (Tr. 42.)  He explained there were a lot times when he was unable to control his responses.  (*Id*.)   When asked about the circumstances surrounding the consultative examination with Dr. Davis, he stated:

> I just though[t] he was being very condescending.  And when we got to talking about my prison history, you know he told me it was a choice that I made.  He told me I went to jail because it was my choice and I got kinda upset, and I probably said some things, and he had to ask me to leave.

(Tr. 42-43.)

Mr. Johns reported taking medication for depression and anxiety, but said he did not think it helped.  (Tr. 43.)  He also reported taking a sleeping pill.  (Tr. 43, 44.)  He acknowledged there were days when he would forget to take his medications, and that he lost control more easily when that occurred.  (Tr. 43.)   He explained that his medication kept him calmer and gave him the opportunity to think before saying something.  (Tr. 44.)  However, he said there were times that he lost control even on days when he took his medication.  (Tr. 45.)

Mr. Johns testified that he kept to himself and did not socialize with his neighbors.  (Tr. 49.)  He reported being sober for six years and attending NA meetings four to five times a week.  (Tr. 49-50.)  He had a sponsor but was not a sponsor himself.  (Tr. 50.)  He explained that there were a lot of meetings in his area, and that he walked to meetings a lot of the time, but sometimes would get a ride or take the bus.  (*Id*.)  He stated he had a driver's license but did not drive, and reported taking a bus to the hearing.  (Tr. 50.)  He testified that he had played softball in the past but no longer did.  (*Id*.)  He stated he watched sports on television.  (Tr. 50-51.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 51-58.)   For his first hypothetical, the ALJ asked the VE to assume an individual with past work as a housekeeping cleaner who would have the following restrictions:

> would be able to work at all exertional levels, but for today's purposes, we'll say medium, but would have the following further restrictions, the hypothetical individual would be limited insofar as they would be able to perform work that does not involve assembly line pace, would have only superficial interaction with supervisors, coworkers and the general public, and would only, would be able to adapt only to occasional changes in the work setting.

(Tr. 52-54.)  The VE testified the described individual would be "able to perform the past jobs as described earlier in testimony."  (Tr. 54.)  The VE also testified that there would be other work in the national economy at the medium level that the individual could perform, including industrial cleaner, laundry worker II, and store laborer.  (Tr. 54-55.)

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical with the following additional restrictions: occasional use of ramps and stairs, no use of ladders, ropes, or scaffolds, and occasional balancing, kneeling, stooping, crouching, and crawling.  (Tr. 55.)  With those added restrictions, the VE testified the individual could perform the jobs of cleaner housekeeping, laundry worker, and laborer, but not the industrial cleaner job.  (*Id.*)

The VE also testified that there would be no work available for an individual described in either hypothetical if the individual could have no interaction with coworkers or the public, or if the individual would be off-task twenty percent of the workday due to the need to take breaks throughout the day to collect oneself.  (Tr. 55-56.)

Mr. Johns' counsel asked the VE: "As you reviewed the record and heard the testimony of Mr. Johns here today, how would you have categorized the past work?"  (Tr. 57.)  The VE responded that she would have classified the job as "industrial cleaner."  (*Id.*)  In response to

follow-up questioning from the ALJ, the VE confirmed that industrial cleaner was one of the jobs she had already testified could be performed by the hypothetical person described in the first hypothetical.  (*Id.*)  The VE then testified that none of the jobs she identified in response to the hypotheticals, including industrial cleaner, would be available for an individual who could only stand for fifteen minutes every hour.  (Tr. 57-58.)  She further stated that there would be no medium work that an individual with that limitation could perform.  (Tr. 58.)

### III.      Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920;  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L.

Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in

the national economy.  *Id.*

## IV.     The ALJ's Decision

In his February 26, 2020 decision, the ALJ made the following findings:[1]

1.     The claimant has not engaged in substantial gainful activity since January 10, 2019, the application date.  (Tr. 18.)

2.     The claimant has the following severe impairments: affective disorder, anxiety disorder, and personality disorder.  (Tr. 18-19.)  The following impairments were found to be nonsevere: Achilles tendinitis, obesity, and a history of polysubstance abuse in remission.  (*Id.*)

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 19-20.)

4.     The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional

---

[1] The ALJ's findings are summarized.

limitations: can perform work that does not involve assembly-line pace; can only have superficial interactions with supervisors, coworkers, and the general public; and can adapt to only occasional changes in the work setting.  (Tr. 20-24.)

5. The claimant is capable of performing past relevant work as a housekeeping/cleaner. (Tr. 24.)  Alternatively, considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform such as industrial cleaner, laundry worker II, and store laborer.  (Tr. 24-25.)

Based on the foregoing, the ALJ determined that Mr. Johns had not been under a disability since January 10, 2019, the date the application was filed.  (Tr. 26.)

## V.    Plaintiff's Arguments

Mr. Johns challenges the constitutional authority of the Commissioner to decide her case, and raises substantive objections to his decision as follows:

1. The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.  (ECF Doc. 13 pp. 1, 7-8; ECF Doc. 13 pp. 2-7.)

2. The ALJ committed harmful error when he relied on the prior ALJ's decision which was issued by an ALJ who had not been properly appointed.  (ECF Doc. 13 pp. 1, 8-10; ECF Doc. 16 p. 1.)

3. The ALJ committed harmful error forming the RFC when he failed to properly evaluate the evidence documenting Johns' severe impairments and misinterpreted the opinion of the treating source.  (ECF Doc. 13 pp. 1, 11-19; ECF Doc. 16 pp. 1-2.)

4. At Step Four and Step Five of the Sequential Evaluation, the ALJ's RFC was not supported by substantial evidence when he erroneously found that Johns could still perform his past work or other work which existed in the national economy on a full-time and sustained basis.  (ECF Doc. 13 pp. 1-2, 19-21.)

18

## VI.     Law & Analysis

**A.     Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the

Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact

if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*,

474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within

which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581

F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court

"may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of

credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**   **First Assignment of Error: Whether Mr. Johns Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Mr. Johns argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles. (ECF Doc. 13 pp. 1, 7-8; ECF Doc. 16 pp. 2-7.) Specifically, he argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United

20

States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*.  (ECF Doc. 13 pp. 7-8 (challenging 42 U.S.C. § 902(a)(3)).)  Mr. Johns argues based on this precedent that the ALJ's authority to issue the decision in this case was "constitutionally defective" because his authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority.  (ECF Doc. 13 pp. 1, 7-8; ECF Doc. 16 pp. 2-7.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 15 pp. 3-4 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Mr. Johns is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (*Id.* at 4 (citing *Collins v. Yellen*, ––– U.S. ––––, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the Commissioner argues that Mr. Johns cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Mr. Johns cannot show that the removal restriction caused the denial of his benefits.  (ECF Doc. 15 p. 4.)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with numerous other courts that Mr. Johns' constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Mr. Johns lacks standing to assert the

challenge.[2]  *See Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, *9 (N.D.

Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, --- F.Supp.3d ---, 2021 WL 5882671, at

*10 (N.D. Ohio Dec. 13, 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602-

TLF, 2021 WL 5276522, *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No.

20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*,

No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No.

21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot

address the merits of a claim.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118

S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it

ceases to exist, the only function remaining to the court is that of announcing the fact and

dismissing the case.")  Although the Commissioner did not directly challenge Mr. Johns'

standing in this case, this Court has the ability and the obligation to raise the issue of standing

*sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598,

607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction,

it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be

waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct.

1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by

the Commissioner in her briefing – that Mr. Johns did not suffer actual harm caused by the

statutory removal provision – is also a key element of the standing analysis discussed herein.

(ECF Doc. 15 p. 8.) *See also Rhouma*, 2021 WL 5882671, at *10 (raising standing *sua sponte*

---

[2] The Commissioner also argues that Mr. Johns' request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential considerations.  (ECF Doc. 15 pp. 4-15.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments will not be addressed herein.

when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Mr. Johns must satisfy a three-pronged test to establish Article III standing, namely: "[he] must show that [he] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [he] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void."  141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))).   However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone."  141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Mr. Johns bears the burden of establishing standing for each claim and form of relief.  *See Loren*, 505 F.3d at 607 (citing *Lujan*

*v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992));

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S.Ct. 1854, 1867, 164 L.Ed.2d 589

(2006).  Mr. Johns argues that the requirements for standing are met because the Commissioner

did not argue otherwise, and for the reasons set forth in two district court cases addressing

similar constitutional challenges.  (ECF Doc. 16 p. 3 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-

00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-

CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and*

*recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7,

2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Mr.

Johns has successfully demonstrated that the "traceability" requirement is met in this case.

 The court in *Brinkman* did face a similar challenge to an ALJ decision based on the

alleged unconstitutionality of the statutory removal provision for the Commissioner of Social

Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by

Mr. Johns in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because

Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional

challenge."  *Id.* at *2.  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff

offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by

the SSA Commissioner, she has not demonstrated traceability and her constitutional violation

claim fails for lack of standing."  *Id.* (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct.

at 1779).  This case clearly does not support a finding that Mr. Johns has demonstrated standing

to pursue his constitutional claim in this case.

 In contrast, the court in *Sylvia* found that the "traceability" requirement was met for a

similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the

ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3.  In so finding, the court relied in part on another court's observation that "[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate."  *Id.* (quoting *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 551 F.Supp.3d 1054, 2021 WL 3269640, at *5 (D. Colo. July 29, 2021)). Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null."  *Tafoya*, 551 F.Supp.3d at 1061.

Consistent with the findings in *Sylvia* and *Tafoya*, Mr. Johns asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 13 p. 8; ECF Doc. 16 pp. 2-3, 5.)  In other words, he contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to him.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office."  141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void."  *Id.* at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S.

Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Mr. Johns was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void."  *Collins*, 141 S. Ct. at 1788, n. 24.  In addition to arguing that the ALJ lacked delegated authority to issue his decision, Mr. Johns asserts that the ALJ decided this case "based on regulations promulgated by Mr. Saul when he had no authority to issue the same," and more specifically that the former Commissioner "implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)" and "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015."  (ECF Doc. 13 p. 8; ECF Doc. 16 p. 4.)

First, Mr. Johns' arguments on this point are underdeveloped, as he has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  To demonstrate standing, Mr. Johns must show that the policy and/or regulatory changes implemented by the former Commissioner adversely affected him.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Second, even a cursory review of the actions of the former Commissioner identified by Mr. Johns reflects that those actions are not traceable to harm asserted by Mr. Johns in this case.  As to the identified changes to HALLEX, an internal procedural manual for the

Social Security Administration, the cited change pertains to the way that Office of Hearings

Operations staff will respond when a notice of hearing acknowledgement is not returned.  *See*

HALLEX I-2-3-20.[3]  No challenge is raised in this case regarding deficiencies with the notices

of hearing.  As to the identified changes to the musculoskeletal listings, it is evident that the

identified changes took effect on April 1, 2021, almost one year after the ALJ's decision in this

case (Tr. 12-29), and thus could not have impacted this decision.  *See* DI 34121.013.[4]  Unlike the

shareholders in *Collins*, whose injury – the loss of net worth in companies in which they owned

shares – was directly traceable to the Federal Housing Finance Agency Director's amendment of

the formula to calculate dividends, here Mr. Johns has not demonstrated that the regulatory

changes he identifies impacted the denial of benefits.  *Collins*, 141 S. Ct. at 1779.

Consistent with the findings of other courts, the undersigned therefore concludes that Mr.

Johns has failed to establish that he has suffered harm traceable to an unlawful action by the

former Commissioner of Social Security, and has accordingly failed to establish standing to

pursue this constitutional challenge.  *See, e.g., Rhouma*,  2021 WL 5882671 at * 11 ("Without a

harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to

challenge the constitutionality of § 902(a)(3)."); *Catherine J.S.W.*, 2021 WL 5276522 at *8

("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former

Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation

---

[3] The February 23, 2021 revision of HALLEX I-2-3-20 "updated and clarified the action that Office of Hearings
Operations (OHO) staff will take if a claimant or appointed representative does not return an acknowledgement of the
notice of hearing."  Transmittal I-2-240, Soc. Sec. Admi. Office of Analytics Review and Oversight, available at
https://www.ssa.gov/OP_Home/hallex/TS/tsi-2-240.html#:~:text=This%20transmittal%20amends%20section%20I-
2-3-
20%20of%20the%20Hearings%2C,404.938%20and%20416.1438.%20Explanation%20of%20Content%20and%20
Changes (last visited 4/1/2022).

[4] https://secure.ssa.gov/poms nsf/lnx/0434121013 (last visited 4/1/2022).

is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments."); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.").

Because the undersigned concludes that Mr. Johns does not have standing to proceed with his separation of powers constitutional claim, the undersigned recommends that the Court deny Mr. Johns request for a remand based on the asserted constitutional challenge.

**C.      Second Assignment of Error: Whether Plaintiff May Challenge Constitutionality of 2015 ALJ Decision**

In a somewhat tortured attempt to expand on his constitutional arguments in Section VI.B., *supra*, Mr. Johns also seeks to assert a time-barred challenge to the appointment of the ALJ who issued his 2015 disability decision, arguing that "this issue was not forfeited" because the Supreme Court and Sixth Circuit recently decided "that claimants are not required to exhaust certain issues in administrative proceeding [sic] to preserve them for judicial review."  (ECF Doc. 13 p. 10 (citing *Carr v. Saul*, 141 S.Ct. 1352, 1362 (2021) and *Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 547 (6th Cir. 2020).)  This argument is without merit.

The Supreme Court in *Carr* addressed a very narrow question: "whether [Social Security disability] petitioners forfeited their Appointments Clause challenges by failing to make them first to their respective ALJs."  *Carr*, 141 S. Ct. at 1356.  The Court determined that Social Security disability claimants were "not required to exhaust certain issues in administrative

proceedings to preserve them for judicial review," and therefore concluded that "claimants who raise those issues for the first time in federal court are not untimely in doing so." *Id.* at 1362.

The cited cases would support Mr. Johns if his argument were that he failed to challenge the appointment of the ALJ who issued the February 26, 2020 decision that is before this Court, and wished to raise that new challenge in the present appeal. But that is not the relief Mr. Johns seeks. Instead, he seeks to raise a constitutional challenge to a 2015 ALJ decision that is not before this Court, and which has been a final decision of the Social Security Administration for several years. Mr. Johns has cited no authority to support such relief.

The evidence reflects that the prior ALJ decision Mr. Johns now seeks to challenge was issued on January 30, 2015 (Tr. 60), and the Appeals Counsel denied Mr. Johns' request for review on May 1, 2015 (Tr. 79-84), making the 2015 ALJ decision the final decision of the Commissioner on that date. While there is no evidence of record relating to any federal court appeal, it is noted that any such appeal was required to be filed "within sixty days after the mailing … of notice of" the final decision of the Commissioner. *See* 42 U.S.C.A. § 405(g). Because Mr. Johns' challenge to the appointment of the prior ALJ relates to a final decision of the Commissioner that was not timely challenged and that is not presently before this Court, the undersigned finds this argument to have no merit.

**D.      Third Assignment of Error: Whether RFC is Supported by Substantial Evidence**

As it pertains to Mr. Johns' third assignment of error, the undersigned has determined that the following issues were sufficiently identified and argued: (1) whether the ALJ's finding that Mr. Johns' physical impairments were nonsevere is supported by substantial evidence (ECF Doc. 13 pp. 11-12; ECF Doc. 16 p. 1); (2) whether the ALJ's finding that Mr. Johns had no more than moderate limitations in the four categories of mental functioning at Step Three is supported

by substantial evidence (ECF Doc. 13 pp. 12-16; ECF Doc. 16 p. 2); and (3) whether the ALJ properly evaluated the opinion of Mr. Johns' treating psychiatric nurse practitioner (ECF Doc. 13 pp. 16-19; ECF Doc. 16 p. 2).  Each of these arguments will be addressed in turn below.

To the extent that Mr. Johns intended to raise additional claims as part of his third assignment of error, they were raised in a perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting plaintiff did not sufficiently present her claimed errors); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

### 1.    Whether ALJ Erred in Finding No Severe Physical Impairments

Mr. Johns contends that the ALJ erred in finding he had no severe physical impairments. (ECF Doc. 13 pp. 12-13; ECF Doc. 16 p. 1.)  He asserts that the ALJ "erroneously adopted the decision of the prior ALJ and found that there were no physical severe impairments," while his "testimony combined with his treatment at MetroHealth" established a severe physical impairment.  (ECF Doc. 13 p. 12.)   The Commissioner responds that the ALJ "reasonably determined Plaintiff did not have any severe physical impairments."  (ECF Doc. 15 pp. 15-17.)

To the extent this argument hinges on Mr. John's assertion that the ALJ improperly relied on the 2015 prior ALJ decision because that ALJ was not properly appointed, the argument was addressed in Section VI.C. *supra*, and found to be without merit.  Moreover, it is well-

established that an ALJ may – and indeed should – consider relevant findings in a prior ALJ decision when adjudicating a new claim. *See Earley v. Commissioner*, 893 F.3d 929, 934 (6th Cir. 2018) ("Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making."); *see also* Acquiescence Ruling 98-4(6), 63 FR 29771-01, 29773. Here, the ALJ considered whether the record contained new and material evidence demonstrating that Mr. Johns had a severe physical impairment, and found it did not. (Tr. 15.) In addition to discussing the evidence considered by the prior ALJ in finding Achilles tendinitis to be a non-severe impairment, the ALJ also noted the lack of new imaging or material change in conservative treatment since that prior decision, and explicitly outlined the recent examination findings and treatment modalities that supported his finding that this impairment remained non-severe. (Tr. 18.) He also considered new evidence regarding Mr. John's obesity, and found that impairment to be non-severe as well. (*Id.*)

Because Mr. Johns has failed to show that the ALJ erred in considering the prior ALJ findings regarding his physical impairments, the undersigned turns next to whether the Step Two finding that Mr. Johns has no severe physical impairments is supported by substantial evidence.

### i.    Analysis for Step Two Determinations

A claimant bears the burden of showing the severity of his impairments. *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986). A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work

activities." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)). Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

In this case, the ALJ discussed Mr. Johns' physical impairments, related treatment findings, and subjective allegations regarding his physical limitations (Tr. 18-19, 21) and stated that he had "considered all of [Mr. Johns'] medically determinable impairments, including those that are not severe, when assessing [his] residual functional capacity" (Tr. 19). He went on to conclude that the evidence did not support a finding that Mr. Johns' physical impairments "would have more than a slight effect on [Mr. Johns'] ability to work" (Tr. 18) and adopted an RFC without any exertional limitations (Tr. 20).

The question thus becomes whether the ALJ's finding that Mr. Johns did not have severe physical impairments or exertional limitations was supported by substantial evidence, i.e., "more than a scintilla of evidence but less than a preponderance" and "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Besaw*, 966 F.2d at 1030.

ii.     **Whether Substantial Evidence Supported Finding That Physical
Impairments Non-Severe and Caused No Functional Limitations**

Mr. Johns asserts that his "testimony combined with his treatment at MetroHealth

established that he had a physical severe impairment." (ECF Doc. 13 p. 12.)  In particular, he

points to testimony that: (1) he was unable to work because he could not stand very long due to a

torn Achilles tendon from 2007 or 2008 that had not healed properly; (2) he could stand for only

ten to fifteen minutes before his lower back would start to hurt and he would need to sit down for

forty-five minutes; and (3) his pain impacted his agitation and irritability.  (*Id*. (citing Tr 40, 47

(hearing testimony).)  The MetroHealth record he points is a June 6, 2018 treatment record

regarding persistent midline low back pain, right anterior knee pain, and right Achilles pain that

incorporated findings from a 2014 right ankle MRI.  (*Id*. (citing Tr. 349, 350.)

As an initial matter, it is noted that Mr. Johns did not allege disability due to any physical

impairment in his SSI application.  (*See* Tr. 85-86, 95, 184 (alleging disability due major

depressive disorder, PTSD, anxiety disorder, panic disorder, antisocial personality disorder, and

cocaine abuse).)   Nevertheless, the ALJ did consider Mr. Johns' testimony, the MetroHealth

June 2018 MetroHealth record, the 2014 MRI, and other evidence relevant to Mr. Johns' alleged

physical impairments and pain.  (Tr. 18, 21.)  In doing so, the ALJ explained:

> The claimant made allegations regarding his Achilles tendon at the hearing, citing
> an old injury that did not heal correctly.  The previous decision found that this
> impairment was non-severe.  In making this finding, the previous decision cited
> that the claimant had restrictions for this impairment while in prison but these were
> removed once the claimant was witnessed to be playing softball and using a gym.
> The decision cited that the claimant wrote in his function report in 2013 that he
> could walk a great distance and did not make physical allegations.  Next, the
> decision cited that the claimant did not seek treatment for this condition until 2014,
> following his previous denial at the reconsideration level.  Regarding treatment, the
> decision cited that the claimant had received limited, conservative treatment
> including citing zero-out-of-ten pain during physical therapy sessions.  The
> decision cited that a 2014 MRI did not show significant changes from a prior

33

> examination, and examination findings consistently showed gait, strength, coordination, and sensation within normal limits.
>
> The current record does not show new imaging and continues to show normal strength, coordination, strength, and gait. Although the claimant is prescribed narcotics, records indicate that this managed the claimant's pain. This does not show a material change in the claimant's conservative treatment. Treatment notes from March 5, 2018, indicated that the claimant managed his pain with narcotics (Exhibit B3F). The examination cited the MRI from 2014. The claimant was within functional limits in the bilateral lower extremities in all planes with some exceptions for pain. The claimant had tenderness to palpation over the right Achilles Tendon insertion. The claimant noted that the claimant had normal coordination, motor strength, sensation, and gait. The claimant was given another prescription for narcotics. A physical examination made the same findings on June 6, 2018 (Exhibit B3F, page 12). Musculoskeletal examination notes from April 30, 2019, June 5, 2019, and October 8, 2019, showed a normal range of motion and no edema or tenderness (Exhibit B6F, pages 15, 28, and 38).

(Tr. 18.)  The ALJ also considered evidence relating to Ms. Johns' obesity, noting that he had a BMI of 33.15, but finding that an individualized assessment did not support a finding that the impairment was severe.  (Tr. 19.)  In addition, the ALJ considered not only Mr. Johns' testimony that he could not stand long due to his Achilles heel injury and back pain, and that his pain made him uncomfortable and impacted his behavior, but also that he lived alone and sometimes walked to AA meetings.  (Tr. 21.)  The ALJ thus did not ignore the evidence highlighted in Mr. Johns' brief (ECF Doc. 13 p. 12) in assessing the severity of his physical impairments.

Further, an examination of both the decision and the underlying evidence shows that substantial evidence supported the ALJ's conclusion that Mr. Johns' physical impairments were not severe and caused no more than minimal functional limitations.  First, the ALJ noted that the 2014 MRI findings that had been considered in the prior ALJ decision remained the most recent imaging regarding his tendinitis.  (Tr. 18, 349, 351.)  While his March and June 2018 examinations did note tenderness to palpation of the right Achilles tendon, the ALJ observed that Mr. Johns nevertheless demonstrated normal coordination, motor strength, sensation, and gait at

those visits.  (Tr. 18, 350, 352.)  He also accurately observed that Mr. Johns' pain was managed conservatively, with narcotics.  (*Id*.)  This is consistent with Mr. Johns' testimony that he stopped physical therapy in 2016 or 2017, and later ceased taking even pain medications.  (Tr. 45-46.)  The ALJ also accurately noted that musculoskeletal examinations findings in April, June and October 2019 showed normal range of motion with no edema or tenderness.  (Tr. 18 (citing 389, 402, 412).)  Treatment recommendations by that time were limited to weight loss and exercise, and his assessments did not identify tendinitis as a condition for which he was receiving treatment.  (Tr. 390, 403, 412-13.)  His reported activities included "going to the Gym" (Tr. 349), taking the bus to get around (Tr. 50), living independently, and attending narcotics anonymous meetings four to five times per week, reportedly walking there a "lot of times" and "sometimes" taking the bus (Tr. 49-50).  (*See also* Tr. 21, 24.)  Taken together, this evidence supplies substantial evidence to support the ALJ's finding that Mr. Johns' examination findings, limited conservative treatment, and activities of daily living are consistent with no more than minimal functional limitations arising from his established physical impairments, a finding that is materially the same as that set forth in the prior ALJ decision.

While Mr. Johns contends that his testimony and treatment records support greater limitations than those found by the ALJ, as explained above, "'[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal citation omitted).  Thus, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Mr. Johns has not demonstrated that the ALJ's consideration of the evidence fell outside the zone of choice

afforded to ALJ.  Nor has he shown that the ALJ's determination that his physical impairments were non-severe was unsupported by substantial evidence.

### 2. Whether ALJ Erred in Finding Mental Impairments Did Not Satisfy Listing

Mr. Johns next argues that the ALJ erred at Step Three in finding that he had moderate limitations in each of the four categories of mental functioning, and therefore did not satisfy the criteria of Listings 12.04, 12.06, and 12.08.  (ECF Doc. 13 pp. 12-17; ECF Doc. 16 p. 2.)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a Listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv's.*, 835 F.2d 139, 140 (6th Cir. 1987)).  Furthermore, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 Fed. App'x 725, 728 (6th Cir. 2004).

Listings 12.04, 12.06, and 12.08 deal with the following mental disorders: depressive, bipolar and related disorders (12.04); anxiety and obsessive-compulsive disorders (12.06); and personality and impulse-control disorders (12.08).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.04, 12.06, 12.08.)  All three of the Listings at issue here incorporate identical paragraph B criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process.  20 C.F.R. §§ Pts. 404, 416.  Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage

36

oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing.  20 C.F.R. § 416.920a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E.

Mr. Johns' argument is focused on two out of the four "B" criteria.  (ECF Doc. 13, p. 14.) Specifically, he contends he "had a marked limitation in his ability to *interact with others* and *adapt or manage himself* as his ability to sustain an activity independently, appropriately, effectively, and on a sustained basis was seriously limited."  (*Id.* (emphasis added).)  The Commissioner responds that the ALJ reasonably found no more than moderate limitations in each of the four "B" criteria.  (ECF Doc. 15 pp. 17-18.)

Notably, the inquiry required here is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could possibly support greater impairment.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).

The ALJ in this case provided a detailed analysis in support of his findings regarding Mr. Johns' level of limitation in each of the "B" criteria functional areas.  (Tr. 19-20.)  With respect to the two functional areas that Mr. Johns challenges, the ALJ explained his findings as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked

limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

\*\*\*

In interacting with others, the claimant has moderate limitations. Here, the claimant alleged that he has difficulty getting along with others including care providers. The record shows the claimant can spend time with family and take public transportation. The record shows the claimant regularly attends narcotics anonymous meetings including traveling and speaking at meetings.

\*\*\*

Finally, the claimant has moderate limitations in his ability to adapt or manage herself. The claimant asserted that he has difficulties managing [his] mood and getting along with caregivers. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene. While some notes describe the claimant as irritable notes also describe the claimant as cooperative.

(Tr. 19-20.)

Mr. Johns asserts that the ALJ's findings were in error because the ALJ should have found marked limitations in these areas. (ECF Doc. 13 p. 14.) In support of this contention, he points to the following evidence: (1) a July 2016 mental health record reflecting subjective reports that he tried to harm others because they made him angry (Tr. 236); (2) an April 15, 2019 mental health appointment when he was agitated and angry over having to see multiple providers and his mood was described as angry, frustrated, and depressed (Tr. 381); and (3) his conduct and demeanor during his May 15, 2019 consultative examination with Dr. Davis (Tr. 372-73). (ECF Doc. 13 p. 14.)

A review of the ALJ's decision reveals that he did not ignore or mischaracterize the identified evidence. He specifically discussed the April 15, 2019 appointment, noting that it reflected Mr. Johns' frustration about having to see multiple providers. (Tr. 22.) He also discussed the consultative examination of May 15, 2019, detailing Mr. Johns' reported frustration and agitation. (Tr. 23.) He considered Mr. Johns' subjective allegations regarding

difficulty getting along with others and managing his mood, as well as objective observations of irritability.  (Tr. 18-19.)  The ALJ also considered Mr. Johns' reports that he had: violent tendencies in the past; difficulties communicating with medical providers; and irritability with having to see multiple medical providers and being asked too many questions.  (Tr. 21-22.)  However, the ALJ also noted that Mr. Johns was able to spend time with family, use public transportation, and attend and speak at NA meetings.  (*Id.*)  He noted that Mr. Johns presented with appropriate grooming and hygiene, and sometimes presented as cooperative instead of irritable.  (*Id.*)  Later, at Step Four, the ALJ detailed Mr. Johns' mental health treatment history, including his subjective symptom reports, medications prescribed to manage his symptoms, and his response to treatment.  (Tr. 21-23.)

The decision makes clear that the ALJ did not ignore evidence relating to Mr. Johns' ability to interact with others and adapt and manage himself.  After considering the record as a whole, the ALJ incorporated the following mental limitations into the RFC: "can perform work that does not involve assembly-line pace; can only have superficial interactions with supervisors, coworkers, or the general public; and can adapt to only occasional changes in the work setting." (Tr. 20.)  Mr. Johns has not shown that that the ALJ's findings of moderate limitations or the mental RFC limitations are unsupported by substantial evidence.  As the ALJ explained, while there was evidence of irritability, frustration, and anger, there was also evidence showing that Mr. Johns was cooperative.  (Tr. 22-23, 393, 397, 415.)  Further, as the ALJ discussed, the record documents that Mr. Johns lived independently, traveled with friends, traveled to NA conventions and spoke a lot, used public transportation, and had a good relationship with his family.  (Tr. 22, 23, 24, 49, 50, 242, 414.)

It is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. The undersigned finds that the decision clearly sets forth the basis for the ALJ's findings at Step Three as to Mr. Johns' mental health impairments, and Mr. Johns has not met his burden to demonstrate that the ALJ's findings were not supported by substantial evidence.

### 3. Whether ALJ Properly Evaluated CNP Koontz's Opinion

Mr. Johns argues that the ALJ erred in his evaluation of the opinion of his treating psychiatric nurse practitioner Koontz because he "misinterpreted the findings of the treating source." (ECF Doc. 13 pp. 17-19; ECF Doc. 16 p. 2.) The Commissioner responds that the ALJ properly found CNP Koontz's opinions "persuasive to the extent they supported moderate limitations as opposed to more extreme limitations." (ECF Doc. 15 pp. 18-19.)

Since Mr. Johns' claim was filed after March 27, 2017, the Social Security Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to his claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules),* 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c. The five categories of evidence to be considered under these regulations include: (1) objective medical evidence; (2) medical opinions; (3) other medical evidence; (4) evidence from non-medical sources; and (5) prior administrative medical findings. 20 C.F.R. § 416.913(a)(1)-(5).

The regulations specify that SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). Distinct from a prior framework that gave more weight to opinions from treating sources, the new regulations provide that "administrative law judges will now evaluate the 'persuasiveness'

of medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation." *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (*quoting Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (*citing* 20 C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-CV-01958-BR, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'") (*citing* 20 C.F.R. §§ 404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors to be evaluated are supportability, consistency, relationship with the claimant, specialization, and other factors, but supportability and consistency are acknowledged to be the most important factors for consideration. 20 C.F.R. § 416.920c(c)(1)-(5); 20 C.F.R. § 416.920c(b)(2).  The regulations define "supportability" as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). The regulations define "consistency" as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

Here, the ALJ considered CNP Koontz's opinions and explained how he evaluated the persuasiveness of the opinions.  (Tr. 23-24.)  He stated:

Peter Shenk Koontz, CNP completed a "mental impairment questionnaire on the claimant's behalf on December 31, 2019 (Exhibit B7F). The first part of the form

41

concerned sustaining concentration and persistence. Mr. Koontz indicated that would have one serious but not precluding limitation out of nine areas listed. In the other eight areas, Mr. Koontz indicated the claimant would have very good or limited but satisfactory abilities. Mr. Koontz indicated that the claimant would be seriously limited but not precluded from working in coordination with or proximity to others without being distracted by them. Mr. Koontz did not indicate the claimant would have any limitations with memory or understanding. The third part of the form concerned social interaction. Here, Mr. Koontz indicated the claimant would have serious but nonpreclusive limitations in four of five areas listed such as interacting appropriately with the general public. The final area regarding adaptation. Mr. Koontz indicated that the claimant would have serious but non-preclusive limitations in one of the three areas listed, responding appropriately to changes in the work setting. The undersigned finds these opinions persuasive to the extent they support the above moderate limitations. On none of the boxes on the form did Mr. Koontz mark that the claimant would not be able to meet competitive standards or would have no useful ability to function. This supports moderate limitations. These moderate findings are supported by Mr. Koontz's most recent treatment notes showing the claimant responding to medication, planning to spend time with family for the holiday including making a turkey, and reading. The opinions are consistent with the record as a whole. The record shows the claimant going to narcotics anonymous meetings including traveling for meetings and working on a community garden. Early records show the claimant doing well and later records show the claimant responding to medication following an adjustment.

(*Id*. (emphasis added).)

In challenging the ALJ's evaluation of CNP Koontz's opinion, Mr. Johns first suggests the ALJ erred because he did not discuss the length and nature of the treatment relationship. (ECF Doc. 13 p. 17.)  While the medical source's relationship with the claimant is a factor to be considered when evaluating a medical opinion, 20 C.F.R. § 416.920c(c)(3), an ALJ is not required to explain how he considered those factors.  *See* 20 C.F.R. § 416.920c(b)(2).  Further, although the ALJ was not obligated to discuss the nature or extent of the treatment relationship, he did nevertheless discuss and detail Mr. Johns' mental health treatment history, including treatment provided by CNP Koontz.  (Tr. 21-22.)  Accordingly, the undersigned finds no error in the ALJ's consideration of CNP Koontz's treating relationship with Mr. Johns.

Second, Mr. Johns asserts that the ALJ's explanation regarding the persuasiveness of CNP Koontz's opinions is unclear and reflects a misinterpretation of the opinion, as well as a failure to cite evidence to support his finding.  (ECF Doc. 13 pp. 17-18.)  The crux of this argument is that ALJ incorrectly "found that the fact that [Mr. Johns] was seriously limited but not precluded [in certain areas] was the same as a moderate limitation." (*Id*. at 18.)  He contends that a "seriously limited but not precluded" opinion is instead effectively a finding of "marked" limitations.  (*Id*.)  The Commissioner does not dispute that the identified language is "akin to a 'marked' limitation," but explains that the ALJ did not err because he did not actually find the language equivalent to a moderate limitation.  (ECF Doc. 15 p. 18.)  Instead, she asserts the ALJ found CNP Koontz's opinion was persuasive only to the extent that it supported "moderate *as opposed to more extreme* limitations."  (*Id.* (emphasis added).)

A review of the ALJ decision does not support Mr. Johns' characterization of the relevant language.  The ALJ did not state that he found the opinions persuasive <u>because</u> CNP Koontz had <u>only</u> found moderate limitations.  Instead, he found the opinions persuasive "<u>to the extent</u> they support … moderate limitations." (Tr. 23 (emphasis added).)   He made this finding after considering the entirety of the opinion and observing that the identified limitations varied from "very good" to "limited but satisfactory" to "seriously limited, but not precluded."  (Tr. 23-24, 419-20.)  He noted that there were no areas in which CNP Koontz had opined Mr. Johns would be "unable to meet competitive standards" or would have "no useful ability to function," and found that this fact "support[ed] moderate limitations."  (Tr. 24.)  He went on to address "supportability" by explaining that the moderate limitations were "supported by Mr. Koontz's most recent treatment notes showing the claimant responding to medication, planning to spend time with family for the holiday including making a turkey, and reading."  (*Id*.)  The ALJ also

43

addressed "consistency" by noting that the opinions were consistent with the record as a whole, which showed Mr. Johns "going to narcotics anonymous meetings including traveling for meetings and working on a community garden," and contained "[e]arly records show[ing] the claimant doing well and later records show[ing] [him] responding to medication following an adjustment." (*Id*.)

As a whole, the undersigned concludes that Mr. Johns has not met his burden to demonstrate that the ALJ mischaracterized CNP Koontz's findings in a way that failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877. It is evident that the ALJ accurately described the underlying records and appropriately addressed the required regulatory factors. Thus, Mr. Johns has not met his burden to demonstrate that the relevant findings were not supported by substantial evidence.

**E.     Fourth Assignment of Error: Whether Findings That Mr. Johns Could Perform Past Work and Other Work Were Supported by Substantial Evidence**

Mr. Johns challenges the ALJ's Step Four and Five findings, arguing: (1) the ALJ erred at Step Four because he incorrectly found that Mr. Johns' past work was that of a housekeeping cleaner, when testimony elicited at the hearing supported a finding that his past work was that of an industrial cleaner (ECF Doc. 13 pp. 19-20); and (2) the ALJ erred at Step Five because the hypothetical question, like the RFC, was not supported by substantial evidence (*Id*. at pp. 20-21.) The Commissioner responds that the Step Five finding is supported by substantial evidence and any error at Step Four was therefore harmless. (ECF Doc. 15 pp. 21-22.)

**1.     Whether Step Four Finding is Supported by Substantial Evidence**

At Step Four of the sequential analysis, the ALJ effectively adopted the prior ALJ's determination that Mr. Johns had past relevant work as a housekeeping cleaner, a light exertional job, but adjusted the DOT code to correct a clerical error. (Tr. 16, 24.) In doing so, the ALJ

acknowledged that Mr. Johns had provided new testimony regarding the relevant work, but stated he was not persuaded by the new testimony and found the prior classification remained appropriate.  (Tr. 16.)  Mr. Johns contends that this finding was in error because the VE opined that the new job description he offered in testimony was appropriately classified as an industrial cleaner, a medium exertional job.  (ECF Doc. 13 p. 20 (citing Tr. 54, 57).)  Mr. Johns further argues that the error was harmful because the VE "had earlier testified that the hypothetical person could not perform the job of industrial cleaner."  (*Id.* (citing Tr. 55).)

A review of the hearing transcript reveals that Mr. Johns' argument is not supported by the record.  When asked about the hypothetical limitations that form the basis for the RFC at issue in this case (Tr. 20), the VE testified not only that the hypothetical individual could perform the housekeeper cleaner job that the ALJ classified as past relevant work, but also that the individual could perform the industrial cleaner job Mr. Johns now argues was the more appropriate work classification.  (Tr. 52-54 (finding hypothetical individual could perform previously identified housekeeper cleaner job and other jobs that included industrial cleaner), (Tr. 57 (classifying work described in testimony as industrial cleaner, but confirming industrial cleaner was the "sample job" previously identified as a job the individual in the first hypothetical could perform).)  While the VE did testify that the industrial cleaner job was not available in response to a later hypothetical (Tr. 55), that fact is irrelevant as the later hypothetical was not adopted as the RFC in this case.

Because the VE clearly testified that both of the potential past work classifications could be performed by an individual with the functional limitations set forth in the RFC, the undersigned concludes that any error in failing to modify the work classification from the prior ALJ decision can be no more than a harmless error.  *See Sickinger v. Comm'r of Soc. Sec.*, No.

1:21-CV-327, 2022 WL 708195, at *14 (N.D. Ohio Feb. 24, 2022) ("although the ALJ's explanation was not perfect, it is capable of meaningful judicial review" (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) as stating, "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."), *report and recommendation adopted Sickinger, v. Comm'r of Soc. Sec.*, No. 1:21CV327, 2022 WL 704582 (N.D. Ohio Mar. 9, 2022). The harmless nature of any such error is made further evident by the ALJ's additional finding that Mr. Johns could perform other work at Step Five of the sequential analysis, including the jobs of laundry worker and store laborer. (Tr. 24-25, 54-55.)

For the reasons set forth above, the undersigned finds there is substantial evidence in the record to support a finding at Step Four that Mr. Johns' past work does not require performance of work-related activities precluded by his RFC, regardless of whether the work is classified as housekeeping cleaner or industrial cleaner. Furthermore, because the Step Five finding also has the support of substantial evidence, as discussed below, any error at Step Four is harmless.

### 2. Whether Step Five Finding is Supported by Substantial Evidence

Finally, Mr. Johns challenges the ALJ's Step Five finding, arguing the evidence does not support a finding that he can perform the identified medium work because the VE testified there would be no jobs available if he had to work without interacting with coworkers or the public, or if he could only stand for fifteen minutes per hour. (ECF Doc. 13 pp. 20-21.) It is evident that neither of the hypothetical limitations described by Mr. Johns in this argument was adopted by the ALJ in his RFC. (Tr. 20.) Accordingly, the Commissioner contends that this argument "is,

in essence, a meritless reformulation of his argument attacking the adequacy of the ALJ's RFC determination with regard to his impairments."  (ECF Doc. 15, p. 20.)

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Parks v. Social Sec. Admin.*, 413 Fed. App'x 856, 865 (6th Cir. 2011).   "Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks*, 413 F. App'x at 865 (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The undersigned concurs with the Commissioner that Mr. Johns' Step Five arguments amount to nothing more than a restatement of his earlier challenges to the ALJ's findings regarding his physical and mental impairments.   As explained at length above, Mr. Johns has not met his burden to demonstrate that the ALJ lacked substantial evidence to support the RFC limitations.   Since the ALJ relied upon VE testimony in response to a hypothetical question containing those same RFC limitations, the undersigned finds no merit to Mr. Johns' argument that the ALJ improperly relied upon the VE's testimony to support his Step Five finding.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.


April 25, 2022                                          /s/  Amanda M. Knapp
                                                       _____
                                                       AMANDA M. KNAPP
                                                       UNITED STATES MAGISTRATE JUDGE




## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).